141 Cal.App.2d 309 (1956)
Estate of WILLIAM H. TALBOT, Deceased. WELLS FARGO BANK AND UNION TRUST COMPANY, Individually and as Trustee, etc., Appellant,
v.
WILLIAM C. TALBOT, an Incompetent Person, etc., Respondent.
Civ. No. 16567. 
California Court of Appeals. First Dist., Div. One. 
May 7, 1956.
 Heller, Ehrman, White & McAuliffe, Lloyd W. Dinkelspiel, Lawrence C. Baker, Lillick, Geary, Olson, Adams & Charles and Gilbert C. Wheat for Appellant.
 Marcel E. Cerf and Robinson & Leland for Respondent.
 PETERS, P. J.
 The Wells Fargo Bank and Union Trust Company is the trustee of a trust created by the will of William H. Talbot. In October of 1951 it filed its twentieth account, asking, among other things, for court approval of a transaction in which the trustee had sold many of the common stocks owned by the trust, and bought government bonds. As a result of such sales a large capital gains tax had to be paid, and the income of the trust was reduced. One of the three income beneficiaries [fn. *] filed objections and exceptions to the account, alleging that the sale of the stocks and purchase of the bonds constituted a breach of trust. The trial court so found and ordered the trustee to pay into the trust for the benefit of respondent one-third of all actual and potential losses suffered by the trust as a result of such sales. The trustee appeals.
 William H. Talbot died in 1930. By his will he created several trusts, naming appellant as trustee. One such trust bequeathed certain stocks to appellant as trustee with instructions *311 to pay the net income to his three children, Vera Talbot, now Vera Talbot Michelson, William C. Talbot, Sr., and Frederick E. Talbot. Upon the death of any child his or her share of the income was made payable to the issue of such child, and, if none, then to the surviving children of the testator. Upon the death of the last of the three children the trust is to terminate, and the corpus is to be paid to the lawful issue of the deceased children by right of representation. One of the three children of the testator, William C. Talbot, Sr., died in 1941, leaving respondent William C. Talbot, Jr., as his only child. Respondent thus succeeded to his father's one-third share of the trust income. The other two children of the testator were still alive at the time of trial.
 On February 1, 1951, the gross value of the trust estate was $3,033,782.86, of which 49.9 per cent was invested in tax exempt and taxable bonds, 48 per cent in first-rate common stocks, and the remainder in preferred stocks and cash.
 Under the terms of the trust the trustee had broad powers of sale and investment. In this connection the trust empowered the trustee: "To invest and reinvest, hold, exchange or sell, convey or dispose of any or all of the property held by it as such Trustee ... for cash or exchange or upon credit, either at public or private sale, and either with or without notice, and without any application to, order from, or the intervention of any Court, and upon such terms or conditions as said Trustee may think proper, and to collect the income arising therefrom, and generally to manage the same as it may think best, without any order from or confirmation of Court."
 The challenged transaction occurred under the following circumstances: On February 1, 1951, Frederick C. Talbot, one of the income beneficiaries, telephoned to Mr. J. A. Ducournau, vice-president in charge of appellant's trust investment and securities analysis department, to talk about the trust portfolio. The substance of this conversation was reduced to a memorandum by Ducournau, and was introduced in evidence. It reads in part: "Mr. Fred Talbot telephoned me in the afternoon of February 1 saying that he had been giving careful consideration to the common stockholdings in this trust and had tabulated a group of them which showed profits and that he was sending the tabulation over to me by Mr. Dudley Heron, who was at that time in his office. Mr. Talbot stated *312 that his memorandum would show that this group of stocks cost $423,000, now had a value of approximately $778,000, and that a profit of $355,000 was indicated at present market prices. Mr. Talbot stated with respect to this list of stocks that he had sold practically all of his personal stockholdings, that he did not like the looks of the market, and thought there was considerable speculation developing in it, and that, therefore, he wished us to sell the list of stocks referred to above. He stated that the sale and reinvestment of the proceeds in Government bonds would result in a small reduction in income to the beneficiaries, but that this small loss in income was more than compensated for by the profits taken. With respect to the proceeds, less taxes, from the sales, Mr. Talbot stated he would like to see them employed in Government bonds with the hope that by the end of one, two or three years we could repurchase stocks on a more favorable basis."
 At the time of this conversation the Dow Jones average for industrial stocks was at its highest peak in 20 years, being at 252. It is presently over 500.
 Appellant's officers testified that it is their policy, as a matter of courtesy to beneficiaries, to consider the views and desires of beneficiaries on matters of policy; that on previous occasions they had consulted with Frederick C. Talbot on trust investments; that on previous occasions they had sometimes agreed and sometimes disagreed with such suggestions; that they believed Frederick C. Talbot to be a man of sound business judgment; that in the past Frederick C. Talbot had acted as spokesmen for the other two income beneficiaries; that in the past the other income beneficiaries had not taken an active interest in the administration of the trust.
 Ducournau, after the telephone call, discussed Frederick C. Talbot's suggestion with Rebele, first vice-president of appellant, and told him that he believed the trustee should comply with the suggestion. Because of the size of the transaction, however, they agreed to defer a decision until they had conferred with Hellman, president of appellant.
 On the evening of February 1st, Ducournau again talked with Frederick C. Talbot in order to determine if he was authorized to speak on behalf of the other two income beneficiaries. Frederick replied that he had spoken for them in the past, and that appellant had, where it agreed with him, followed such suggestions.
 The memorandum, prepared by Ducournau, then describes what happened on February 2, 1951: *313
 "On the morning of February 2, prior to Mr. I. W. Hellman's arrival [prior to 9 a. m.]; Mr. Rebele raised the question of whether or not we should ask the parties at interest for a letter confirming our action in this matter, it being assumed that Mr. Talbot was speaking for the other parties at interest and the extent to which such a letter would protect us. This question was raised because of the fact that the sale of the stocks on the list would result in a reduction in common stockholdings beyond that which we were going to in other accounts (and we, of course, had in mind the other Talbot accounts). I spoke to Mr. Grady concerning the question raised, and he made a study of the trust agreement, beneficiaries, remaindermen, etc. We then joined Mr. Rebele and discussed this matter with Mr. I. W. Hellman."
 "It was concluded that I would explain to Mr. Talbot that in view of the size of this transaction and the fact that it would in effect be a reduction in the common stockholdings beyond what we were doing in other accounts, we would have to have a letter from the parties at interest confirming our action; however, we would be willing to execute the orders immediately on his assurance that the parties at interest would concur in this action and we were willing to rely upon his statement that they would do so. In connection with the foregoing, we would have to have letters confirming our action from Mrs. Vera Michelson, Mr. Talbot himself, and Mr. William C. Talbot, Jr."
 "I left the conference, telephoned Mr. Talbot to the foregoing effect, and he stated that it was inconceivable that any of the parties at interest would object to this program and that he was so convinced of the fact that he was perfectly willing for us to execute the orders in accordance with the assumption above. However, he stated he would immediately begin contacting the parties at interest explaining what the program involved."
 It is conceded that, in the absence of the assurance by Frederick C. Talbot that the other two beneficiaries would assent to the transaction, the appellant would not have sold the stocks. It is also admitted that at the times here involved the appellant's general investment policy was to keep common stock holdings to at least 40 to 50 per cent of the market value of the trusts, although the assets of some of its trusts were invested entirely, or almost entirely, in bonds.
 On February 2d and 3d, the appellant, without having *314 received the approval of William C. Talbot, sold, at market, common stocks for $803,264.88. These stocks had cost the trust $417,596.97, so that a profit was realized of $385,667.91 Federal and state taxes amounted to $104,386.02 and costs of the sales were $4,839.53. Thus, the balance left after taxes and expenses was $695,606. This sum the trustee invested in tax exempt municipal bonds.
 After completion of the sales, because of the taxes and expenses resulting from the sales, the value of the corpus of the trust was reduced so that bonds, both taxable and nontaxable, now amounted to 75.4 per cent, common stocks, 22.3 per cent. The balance was in cash or preferred stocks.
 In 1950 the total income of the trust from both taxable and nontaxable items was $103,434.39, which meant a return of 3.4 per cent. After the sales, the income in 1951 was $79,068.01 or a 2.6 per cent return on the corpus. Had the sales not been consummated the return would have been 3.56 per cent, but it should be mentioned that after the sales a greater portion of the income was tax exempt. The gross reduction in respondent's share of the income in 1951 caused by the sale was $4,873.75, which, after taxes, amounted to $3,200.
 Appellant, at the time of the sales, had general knowledge of the three income beneficiaries' tax brackets and sources of income, but not specific knowledge of their 1950 income because the transactions occurred before the 1950 tax returns had been prepared. Appellant also knew the general status of the stock market, and knew, of course, how much the stocks in this trust had cost.
 There is one other matter to which reference should be made. On the afternoon of February 2d, Frederick C. Talbot advised Ducournau that he had secured the telephonic consent of the other two income beneficiaries to the transaction. Appellant, thereafter, requested written consents. These were given by Frederick C. Talbot and Vera Talbot Michelson. Respondent, however, refused to give such written consent, contending that he had not been informed of all the factors involved. Appellant has expressly abandoned the defense that respondent's telephonic consent given to Frederick C. Talbot estops him from objecting to appellant's account, admitting that there is a conflict in the evidence on the issue.
 The trial judge, the Honorable Edmund Scott, rendered a memorandum decision in which he pointed out that the duties *315 of a trustee in such case are set forth in section 2261 of the Civil Code. He then stated:
 "The first requirement of that Section is that the Trustee exercise its judgment."
 "We find that the Trustee did not exercise its judgment, but instead accepted the judgment of Fred Talbot."
 "In our opinion, the decision to buy such an unbalanced amount of municipals, in the hope that in the future they could be sold and the proceeds of the sales, or the proceeds of redemption, could be used to buy back the common stocks sold was contrary to the requirement of permanency, as set forth in said section, and constitutes speculation which is frowned upon by said Section."
 "We hold that, with such a great paper profit on the common stocks, there was no prudent reason, under the circumstances then prevailing, to cause concern over the safety of the capital invested in such stocks. The record shows a real loss in income, even after adjustment for income tax savings."
 "We hold that the Trustee violated the prudent man rule."
 Thus, the trial court was of the opinion, and subsequently found, that the trustee had breached the trust in three respects: (1) It had not exercised its independent judgment in making the sales; (2) that the transaction was speculative; and (3) that the transaction was imprudent.
 The findings, conclusions and judgment spell these views out at length. They are to the effect that the trustee breached the trust in that it "did not exercise its independent judgment, and its actions were not the result of the exercise by the trustee of prudence, prudent thinking, discretion or intelligence, ... Instead the trustee accepted and acted upon the advice and judgment of Frederick C. Talbot that the trustee should engage in said transactions."
 "... and effected said transactions in reliance upon the expectation that all the beneficiaries would confirm its action" and would not have entered into said transaction in the absence of the expected confirmation and assurance.
 The court also found that "the trustee did not exercise the judgment or care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the *316 probable safety of their capital" and specifically found that the stocks were sold for speculative purposes without a prudent reason therefor.
 The trial court declared that by reason of these breaches of trust the respondent was entitled to be placed in the same position as income beneficiary and contingent remainderman that he would have been in had the questioned sales not been had.
 To accomplish this the trial court ordered:
 1. That appellant restore to the trust the sum of $36,408.51, which is one-third of the capital gains taxes and expenses of the sales and purchases, and that appellant pay to respondent and his successors, so long as they remain income beneficiaries, such a portion of the net income of the trust as shall correspond to the proportion that $36,408.51 bears to the value of the trust after the challenged sales, plus the $36,408.51. This, however, is to be charged against respondent in the determination of the right to reimbursement for loss of income resulting from the transaction.
 2. That appellant pay into the trust for disbursement to respondent for loss of income up to August 27, 1951 (the closing date of the account) $4,873.75, plus interest, and the court reserved the question of determining any future loss of income for later periods until the hearing of subsequent accounts.
 3. That upon termination of the trust appellant pay to respondent or his successors in interest a portion of the corpus equal to the proportion that $36,408.51 bears to the value of the trust estate after the sales and purchases here involved. The court reserved the determination of any further loss to respondent as remainderman until the termination of the trust, due allowance to be made for the restoration of the $36,408.51.
 The trial court then entered its decree settling the account and surcharging the trustee. The trustee appeals.
 In this state the duty of a trustee in connection with the investment of trust funds is set forth in section 2261, subdivision 1, of the Civil Code, which reads as follows:
 "(1) In investing, reinvesting, purchasing, acquiring, exchanging, selling and managing property for the benefit of another, a trustee shall exercise the judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but *317 in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of their capital. Within the limitations of the foregoing standard, and subject to any express provisions or limitations contained in any particular trust instrument, a trustee is authorized to acquire every kind of property, real, personal or mixed, and every kind of investment, specifically including, but not by way of limitation, corporate obligations of every kind, and stocks, preferred or common, which men of prudence, discretion and intelligence acquire for their own account."
 This statute, enacted in 1943 to replace the old statutory list of trust investments, embodies the so-called "prudent man rule" first adopted by the Massachusetts courts, and later by many other states. [1] There can be no doubt that, under this section, and pursuant to general law applicable to trustees, the trustee, even where given broad discretionary power of investment, must exercise its independent discretion and judgment in reference to the investment of trust funds. No serious contention is made to the contrary. The trial court has found that in making the sales and purchases here involved the trustee did not exercise its independent judgment but acted upon the advice and judgment of Frederick C. Talbot, and upon his assurance that the other income beneficiaries would consent. The question presented is whether that finding is supported by any substantial evidence or by any reasonable inference therefrom. If there is any substantial evidence, or any reasonable inference from the evidence that supports this finding, it is binding on us, regardless of conflicts.
 Appellant vigorously argues that the only reasonable inference from the evidence is that it did exercise an independent judgment in these transactions. It starts its argument with the general premise, conceded by respondent, that a trustee may seek the advice of others, including the advice of beneficiaries, as long as such trustee exercises its own independent judgment and makes the final decision. [2] It is, of course, a matter of common prudence for a trustee to seek expert advice on investments, and certainly a matter of prudence, common sense and fairness to consult with interested beneficiaries.
 Appellant next argues that since it had the legal and moral right to confer with Frederick C. Talbot, and since in the past it had consulted Frederick C. Talbot who acted for *318 all beneficiaries, and sometimes followed his suggestions and sometimes not, the only legitimate inference is that appellant did exercise its own discretion and judgment. The contrary inference, found by the trial court, is, so it is contended, unsupported as a matter of law.
 Appellant points out that the officers of appellant testified that they exercised an independent judgment. Their testimony is to the effect that they found Frederick C. Talbot's suggestions meritorious because of special circumstances applicable to this trust--the size of the trust, the amount of capital gain, the outside income of the beneficiaries, the conservative nature of the transaction, etc. They testified that they entered into this transaction not merely because Frederick C. Talbot suggested it, but because of these special circumstances, and would not have sold the common stocks had they thought it was imprudent.
 From these facts it is argued that the inference that appellant did not exercise its independent judgment is unreasonable and totally unsupported. It is contended that the evidence that they would not have entered into the deal without the assurance that all the beneficiaries would consent does not support such inference, and, even if it did, such inference was rebutted as a matter of law by the evidence to which reference has been made. The only reasonable inference, so it is argued, is that the trustee consulted with Frederick C. Talbot and desired the consents simply as a matter of courtesy and in keeping with the general policy of the trustee to consult with the beneficiaries as to their desires in reference to investments. Appellant argues that the mere fact that the sales were made almost immediately after they were suggested by Frederick C. Talbot is no evidence that the trustee was following Talbot's desires and not exercising an independent judgment, because as trustee it knew the facts in reference to the assets of the trust, knew the capital gain that would be realized, and the financial circumstances of the beneficiaries.
 There can be no doubt that the evidence referred to by appellant would support a finding that appellant in fact did exercise an independent judgment and discretion. But the trial court has found to the contrary. [3] The question is not whether a finding that an independent judgment was exercised would be supported, but whether the contrary finding is supported by any reasonable interpretation of the evidence. We think it is. *319
 Mr. Ducournau testified that, as a general rule, in most of the other trusts handled by the bank, it was not reducing the common stock holdings below 50 per cent. There were exceptions, but in the absence of "special circumstances" this was the general rule. When asked "Now, the only special circumstances in this trust was that one of the beneficiaries asked you to make the sale, wasn't it?" He replied: "That is the only special circumstance."
 In addition, the memorandum prepared by Mr. Ducournau shows that the transaction was proposed to appellant on February 1st by Frederick C. Talbot. The memorandum shows that, although thereafter the transaction was discussed by appellant's officers, no discussion at all was had as to the merits of the proposal. The officers were simply interested in the question of whether the trustee would be protected by a letter of consent from the three beneficiaries. Admittedly, the officers would not have approved the proposal without the assurance from Frederick Talbot that the other two income beneficiaries would consent.
 It is worthy of note that the sales were made on February 2d and 3d. Prior to these sales no written analysis as to the effect of these transactions on the trust was made. Such an analysis was not made until February 21, 1951, some 18 days after the sales had been consummated.
 It is also significant that during this general period the trustee took no similar action in reducing the proportion of common stock holdings of any other trust under its control, and that, prior to February 1, 1951, the Talbot trust had never been treated any differently than the other trusts handled by the bank insofar as the proportionate holding of common stocks was concerned.
 [4] These various facts and circumstances offer substantial evidence from which the reasonable inference can be drawn that the trustee did not exercise an independent judgment or discretion in these transactions, but simply followed the suggestions and desires of Frederick C. Talbot upon his assurance that the other beneficiaries would consent. This was a breach of the trustee's duty. This inference was not rebutted, as a matter of law, by the testimony of the officers that they did exercise an independent judgment. The trial judge saw and heard these witnesses. He knew, of course, that these witnesses, as officers of appellant, had a vital interest in the outcome of the case. He chose not to believe this portion of their testimony. He had the power so to do. *320 We cannot say, as a matter of law, that he was wrong. This portion of the case involves nothing more than the ordinary case where the respondent produces evidence that supports a reasonable inference. The appellant produces evidence that would support a contrary inference and produces direct evidence of interested witnesses contrary to the inference. The trial judge disbelieves the testimony of the interested witnesses and finds in accord with the adverse inference. An appellate court, under such circumstances, is without lawful power to disturb the finding.
 We conclude that the finding that appellant committed a breach of trust in not exercising its own judgment and discretion in making the sales is supported by the evidence. This conclusion makes it unnecessary to discuss the sufficiency of the evidence to support the findings that the sales were speculative and imprudent, and so in violation of the trustee's duty. [5] The measure of damages for one breach of trust is not any different from the measure of damages for three breaches of trust where, as here, the trustee did not personally benefit from the breach, was not fraudulent, and had broad discretionary powers of sale.
 We turn now to the really difficult issue in this case--the proper measure of damages. The trial court decreed that respondent should be "made whole," and to accomplish this ordered:
 1. That the trustee restore to the trust corpus $36,408.51, which is one-third of the capital gains taxes and expenses incurred by reason of the sales, and further directed that respondent was to receive upon distribution at the termination of the trust "a proportion of the corpus then available for distribution equal to the proportion that $36,408.51 bears to $2,985,028.04."
 2. That appellant pay to respondent for loss of income up to August 27, 1951, the sum of $4,873.75, plus interest. The court reserved the determination of the question of the diminution of income for any future period until the hearing of future accounts.
 3. That after the $36,408.51 has been restored to the trust, until the termination of the trust respondent receive as income beneficiary a portion of the income equal to the proportion that $36,408.51 bears to $2,948,619.53, but such additional income to be charged against respondent and credited against the payments made upon future determination of loss of income as shown on future accountings. *321
 4. That the power to determine any further loss to respondent is reserved until the determination of the trust, due allowance to be made for the restoration of the $36,408.51. Under this allowance the court reserved the power to determine and allow as further damages the amount of any appreciation in the value of the stock sold between the date of sale and the termination of the trust. The appreciable nature of this portion of the award is indicated by the fact that when the stocks were sold the Dow Jones average for industrial stocks was 252, while presently it is over 500. The stocks were sold for over $803,000. One-third of that is over $267,666. Since the stocks to date have approximately doubled in value, if the trust were to terminate right now the trustee under the award would be required to restore over quarter of a million dollars.
 The avowed purpose of this decree as set forth in the judgment was to assure that respondent "should be made whole in connection with the said transactions and as between said objector [the respondent] and trustee the said objector should and shall be placed and maintained in the same position, as beneficiary and as remainderman, severally and respectively, as if said transactions had not been entered into." Thus, the court decreed, in effect, specific reparations.
 At the outset of the consideration of this substantial award it must constantly be kept in mind that appellant, as trustee, was granted by the trust, the power "To invest and reinvest, hold, exchange or sell, convey or dispose of any or all of the property held by it as such Trustee" with or without notice and without prior court approval "upon such terms or conditions as said Trustee may think proper." In other words, had the trustee exercised an independent judgment in good faith it had the power to do precisely what it did do. As already held, the finding that the trustee did not exercise an independent judgment is supported. But by the decree, unless the trustee goes out in the market and buys back one-third of the kinds of stock sold by it, its power of sale, granted by the trust, is forever nullified over this portion of the trust estate. No one contends that the trustee made the sales in bad faith or that it made a profit from the deal. The question is, what is the measure of damages under such circumstances?
 We turn first to the California statutory provisions. The two pertinent code sections are sections 2237 and 2238 of *322 the Civil Code. Section 2237 sets forth the measure of damages to be assessed against a trustee who uses trust property for his own profit, while section 2238 refers to the damages to be assessed against a trustee for a breach of trust committed in good faith. The two sections provide:
 Section 2237 of the Civil Code: "A trustee who uses or disposes of the trust property ... [for his own profit], may, at the option of the beneficiary, be required to account for all profits so made, or to pay the value of its use, and, if he has disposed thereof, to replace it, with its fruits, or to account for its proceeds with interest." (Italics added.)
 Section 2238 of the Civil Code: "A trustee who uses or disposes of the trust property in any manner not authorized by the trust, but in good faith, and with intent to serve the interests of the beneficiary, is liable only to make good whatever is lost to the beneficiary by his error." (Italics added.)
 Obviously, the two sections intended to impose a different measure of damages against a trustee who breaches the trust in bad faith and one who breaches the trust in good faith. But just what this difference is, is rather difficult to determine from the language used. It is appellant's position that under section 2238, where the breach is in good faith, the trustee is liable as a guarantor of the res, the damages being computable once and for all as of the time of the improper act. According to appellant, in such a case there is no liability for any future losses of profits, appreciation in the value in the assets sold, or earnings therefrom. Respondent, on the other hand, contends that under section 2238 the trustee is liable for the loss of all future earnings and future appreciation in value as well as for the loss incurred by the corpus at the time of the sale.
 The difficulty comes in interpreting the language "make good whatever is lost" appearing in section 2238. Section 2237, dealing with breaches of trust involving self-benefit, expressly provides that the beneficiary may recover at his option all lost profits or the proceeds with interest, and, if possible, specific reparation of the trust property. There is no such language used in section 2238, which provides simply that the trustee must "make good whatever is lost." The real question is, at what time should the damages be fixed that the trustee must "make good"? It is quite probable that the Legislature left section 2238 intentionally broad in scope with the intent of allowing a flexible measure of damages, so that the court in each case could fix the proper *323 measure of damages to fit the facts. Under the language used, specific reparations could be decreed, or the court could hold that the trustee has made good the loss, if that loss is fixed as of the day of the default. On the other hand, even though the breach is one made in good faith, it may constitute a breach of loyalty owed by the trustee, or the trustee under the trust may have no power of sale. In such cases the trier of the fact should have some discretion to fix the damages in accordance with the nature and degree of the breach. Where the trust res is held by the trustee without power of sale, and the trustee sells, obviously, the breach, morally, is much more severe than where a broad power of sale is granted. Thus, what constitutes making "good" the loss may vary according to the circumstances.
 This seems to be a reasonable interpretation because, where a broad power of sale exists, the income beneficiary is not legally hurt by reason of the trustee failing to keep certain stocks. [6] That is so because, obviously, in such a case, the income beneficiary has no legal right to compel the retention of any stocks. The right of the income beneficiary is simply to insist that the trustee shall exercise its independent judgment. That right is fundamentally different than the right, where no power of sale exists, to insist on the retention of specific stocks. The measure of damages in the two cases, logically, should be different.
 The general law generally bears out these concepts. A case cited by appellant is directly in point. In Hopkins v. Loeber, 332 Ill.App. 140 [74 N.E.2d 39], two trustees wrongfully delegated to a third trustee the power to sell the trust assets, which he did at an inadequate price. The two consenting trustees did not personally benefit from the sale. As to these two trustees the court held (p. 41 [74 N.E.2d]): "The trust agreement, under which the defendants acted as trustees, gave the defendants broad powers of sale and disposition of the securities in the trust. Where a trustee wrongfully exercises the power conferred upon him by the trust agreement, but is not shown to have personally benefited by his breach of trust or to be guilty of fraud in connection therewith, the authorities are clear that his measure of liability, if any, for the breach of trust, would be the loss, if any, in value of the securities at the time of the breach of trust, and not a value sought to be established some five or six years later." (Italics added.) *324
 The court went on to hold that the trustee who had personally benefited by the transaction was required to respond for the value of the securities that would, had the breach not occurred, inured to the benefit of the trust, measured at the time of suit. This distinction in the rule of damages is reasonable and fair.
 Both parties rely on various parts of the Restatement of Trusts. Appellant points out that section 205, comment "d," which refers to the measure of damages for breach of trust in selling trust assets at an inadequate price, reads as follows: "If the trustee is authorized to sell trust property, but in breach of trust he sells it for less than he should receive, he is liable for the value of the property at the time of the sale less the amount which he received. If the breach of trust consists only in selling it for too little, he is not chargeable with the amount of any subsequent increase in value of the property under the rule stated in Clause (c), as he would be if he were not authorized to sell the property (see 208)."
 Appellant argues that the breach of trust in failing to exercise an independent judgment in exercising a conferred power of sale is analogous to a trustee selling at an inadequate price, and that the measure of damages should be so limited. There would seem to be no difference, in principle, between a breach, in good faith, by selling at an inadequate price, and one where the trustee failed to exercise an independent judgment. The degree of immorality in the two situations would seem to be equal, and the same rule of damages should apply.
 Respondent, in contending for the widest application of the rule of damages, relies upon the code commissioner's notes to the original code section which cites the case of O'Brien v. O'Brien (Ireland, 1828), 1 Malloy 533, under the original section 2238. There the trustee apparently advanced to a life beneficiary certain stock in the corpus of the trust as a loan. There was no fraud or self-dealing in the transaction. The court held that if there had been self-dealing, the beneficiaries, at their option, would have been entitled "to have the produce of the stock with interest, now invested in stock at the price of the day, or to have the stock replaced." But where there was no corrupt motive the trustee "must replace the fund as it stood in stock, but there is no option given in that case." The case is, of course, an old one, and its precise holding is obscure. Whether a power of sale or transfer *325 existed in the case, for example, does not appear. We find nothing very helpful in the O'Brien case.
 The Restatement of Trusts is by no means clear on the point under discussion.
 Section 205 is the section entitled "Liability in Case of Breach of Trust." It reads as follows:
 "If the trustee commits a breach of trust, he is chargeable with"
 "(a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or"
 "(b) any profit made by him through the breach of trust; or"
 "(c) any profit which would have accrued to the trust estate if there had been no breach of trust." (Italics added.)
 There are several comments to the section worth quoting.
 Comment "a" reads, in part, as follows: "... These three types of remedies are not always distinct and are not always all of them available. The situations under which the various remedies are available are considered in the Comments to the three clauses of this Section."
 The comment on clause (c) entitled "h," reads as follows: "If the trustee commits a breach of trust, he is chargeable with any profit which would have accrued to the trust estate if he had not committed such breach of trust. This rule is applicable where the trustee in breach of trust sells or otherwise disposes of trust property which it was his duty to retain (see 208), and where the trustee in breach of trust fails to purchase property which it was his duty to purchase for the trust (see 211). This rule is applicable to income as well as principal. Thus, if the trustee in breach of trust fails to make the trust property productive he is liable for the amount of income which he would have received if he had not committed the breach of trust (see 207)."
 Comment "h" apparently, by its express terms, limits the liability to account for loss of profits to situations where the trustee had a duty to retain the trust corpus or a duty to purchase specific assets. That, of course, is not this case.
 Section 206 of the Restatement refers to liability where there has been a breach of the duty of loyalty. It provides that, in such a case, the trustee may be held for the diminution in value of the corpus, for any profits made by him, or for the profit that should have accrued to the trust. Section 207 merely states that interest runs from the date of breach. *326 Section 208 is entitled: "Liability for Breach of Trust by Selling Trust Property." It reads:
 "(1) If the trustee sells trust property which it is his duty to retain, the beneficiary can"
 "(a) charge him with its value at the time of such sale, with interest thereon; or"
 "(b) charge him with its value at the time of the decree, with the income which would have accrued thereon if he had not sold it, or require him to make specific reparation if this is reasonable under the circumstances; or"
 "(c) require him to account for the proceeds of the sale." (Italics added.)
 Comment "b" under this section sets forth the limitations intended in its application. It reads: "This Section deals only with the situation where the trustee is under a duty to retain trust property throughout and has no authority to sell at any price, at any time, or under any conditions. It does not include the situation where the trustee is authorized to sell, but commits a breach of trust by selling at an improper price or otherwise." (Italics added.)
 It is a fair interpretation of comment "h" to section 205, of section 206, and of section 208, together with the quoted comments, that the authors of the Restatement intended to limit the liability for lost profits to cases either where there was a breach of the duty of loyalty, or where there was a breach of the duty to retain or to acquire specific assets.
 Respondent, in apparent recognition of this limitation in the Restatement, argues that in the instant case there was a duty to retain the stock until there was an exercise of independent judgment on the part of the trustee. Therefore, so it is contended, there was a breach of section 208. This is a play on words. The breach here was not of the duty to retain the stocks, but of the duty to exercise an independent judgment. The two duties are obviously separate and distinct.
 Considering the difference in language between sections 2237 and 2238 of the Civil Code, considering the Restatement provisions above quoted, and giving proper weight to the reasoning in the Illinois case of Hopkins v. Loeber, 332 Ill.App. 140 [74 N.E.2d 39], we are of the opinion that, on principle and as a matter of statutory interpretation, the words "make good whatever is lost" in section 2238 of the Civil Code should be interpreted to mean that for a breach of the type here involved liability is limited to the loss to the *327 corpus, plus interest. Stated another way, in such a situation there is no liability for loss of all income and appreciation that would have resulted had the sale not been made. Certainly, on principle, this is a sufficient burden to place on the trustee in such a situation. To require a trustee who acts in good faith to be a guarantor of all profits that would have been made would be to place such a trustee in the same position as the defaulting trustee who breaches the duty of loyalty. In the latter situation, where there is fraud or self-dealing, or where there is no power to sell, there is moral turpitude in a very real sense, which is not involved in the type of breach here under consideration.
 [7] As applied to the present case these conclusions mean that appellant is under a duty to restore to the corpus for the benefit of respondent the sum of $36,408.51, and to pay interest thereon at the legal rate from the date of breach to the date of restoration. This is the depreciation in the value of the corpus caused by the breach. The other damages provided for in the judgment were erroneously assessed.
 The judgment is affirmed on the issue of liability but reversed on the issue of damages, and the trial court is directed to modify its findings, conclusions and judgment on the issue of damages in accordance with the views herein expressed. Each side to bear his or its costs on this appeal.
 Bray, J., and Wood (Fred B.), J., concurred.
NOTES
[fn. *] *. The other two income beneficiaries do not object to the transaction. The objecting beneficiary, William C. Talbot, has been declared incompetent and he appears through the guardians of his estate.