The conclusion that damages are properly awardable in this case is wrong. The central issues presented are whether the failure of the trustee to sell the bank stock of the trustee bank was a breach of trust and, if it was a breach, whether any compensable injury ensued. While reasonable men may disagree as to whether there was an imprudent investment, Justice Adams, writing for a bare majority of the Court, concludes that there was a breach of the duty of loyalty, in spite of the fact that the trust instruments authorized the very conduct at issue. Just as important, if not more so, he then concludes that, even though the supposed breach resulted in no actual loss, the trustee is liable for lost profits and that the measure of those lost profits can be determined by employing perfect hindsight.
As to the issue of liability, I recognize that in FirstAlabama Bank v. Spragins, 475 So.2d 512 (Ala. 1985) (Spragins I) we observed in dicta that on the basis of the record before us at that time, which is identical to the record before us now, application of the "prudent person" rule revealed that a fact issue was presented on the breach of duty issue. However, we also noted that the record would not support a finding of bad faith or willful mismanagement so as to authorize an award of punitive damages.
On remand the trial court found that the investments were imprudent and that the trustee had acted insensitively to its duty of loyalty by retaining the trustee bank's own stock in the trust.
It is not a breach of the duty of loyalty to retain shares of the corporate trustee where the trust instrument authorizes the trustee to do so. The Restatement (Second) of Trusts provides:
 "Investment by corporate trustee in its own shares. A bank or trust company as trustee cannot properly purchase for the trust its own shares, even though they are purchased from third persons. This is true although the purchase of similar shares of another bank would be a proper trust investment. Such a purchase is proper, however, if expressly or impliedly authorized by the terms of the trust. By the Federal Reserve Board Regulation F, § 11(a), it is provided that "Funds received or held by a national *Page 968 
bank as fiduciary shall not be invested in stock or obligations of, or property acquired from, the bank or its directors, officers or employees, or their interests, or in stock or obligations of, or property acquired from, affiliates of the bank." The Uniform Trusts Act, § 7, provides that "No corporate trustee shall purchase for a trust shares of its own stock, or its bonds or other securities, or the stock, bonds or other securities of an affiliate.
 "A corporate trustee cannot properly retain shares of its own stock which it has received from the settlor as an original investment, unless such retention is expressly or impliedly authorized by the terms of the trust or by statute. Such retention is proper not only when it is authorized in specific terms which refer to the shares, but also where there is a general authorization to retain investments received from the settlor. If, however, because of circumstances which are known or ought to be known to the trustee the retention is or becomes imprudent, it becomes the duty of the trustee to dispose of the shares within a reasonable time. See §§ 230, 231."
Restatement (Second) of Trusts § 20, "Duty of Loyalty" (1959).
Because the retention of the bank stock was authorized, I believed the trial court erred in concluding that there was a breach of loyalty. Furthermore, such a finding would be contrary to our earlier observation that we found no evidence of bad faith. Surely, if a trustee breaches the duty of loyalty, the trustee has acted in bad faith. However, as theRestatement points out, the decision as to how long to retain the stock is guided by the prudent person standard.
As illustrated by the testimony of plaintiffs' principal expert, James King, no one really argues that investing in some shares of the bank stock was imprudent.
 "Q. And based upon what the company has done and what management for the company has done, there is no reason for anybody to have worried about the performance of that company so far as you can ascertain from these records over this 10-year period; is it?
 "A. Yes or no? I think we all worry, people that are in the investment business. I'm not disputing the fact that First Alabama Bancshares is a fine corporation. It is just the percentage of ownership that I am disputing. I think IBM is a fine corporation, also, but I wouldn't put 80 percent in one account, or if I had it I would sell it. First Alabama is unquestionably one of the finest banks in the southeastern bank holding company area and would compare favorably nationally with any bank holding company."
The specific issue is whether the bank was imprudent in failing to diversify the portfolio, which consisted primarily of bank stock.
 "A trustee is relieved of the duty to diversify if it is expressly so provided in the trust instrument. Thus where he is authorized to retain specifically named securities, it is clear that he can retain them even though they constitute a large proportion of the trust estate. The trustee may be impliedly authorized to retain securities of a single issue included in the trust estate at the time of the creation of the trust, even though they constitute a considerable portion of the trust estate. The court is especially likely to find such an intention where the trust estate included shares of a corporation controlled by the testator. A general authorization to retain investments made by the settlor permits the retention of shares of a company which constitute a very large proportion of the trust estate."
 3 A. Scott, The Law of Trusts, § 230.3 at 1876 (1967). The settlor of the trust, Mr. Spragins, was president or chairman of the board of First Alabama Bank, or its predecessors, from 1935 through 1973, and his family had been intimately involved in the operation of the bank before that. The trust instrument provides:
"(3) Powers of Trustee . . .
 "(a) To sell, exchange, transfer, convey, either before or after option granted, all or any part of said Trust Estate *Page 969 
and any trust created herein, upon such terms and conditions as it sees fit to invest and reinvest said Trust Estate and any trust created herein and the proceeds of sale or disposal of any portion thereof, in such loans, stocks, common or preferred, bonds, insurance contracts, or other securities, mortgages, common trust funds, or other property, real or personal, whether so-called 'legal' investments of trust funds, or not, as it may seem suitable, and to change investments and to make new investments from time to time as to it may seem necessary or desirable, regardless of any lack of diversification, risk or non-productivity.
". . .
". . .
 "(d) To hold any property or securities originally received by it as a part of said Trust Estate or any trust estate created herein so long as it shall consider the retention thereof for the best interests of said Trust Estate, irrespective or whether such property or securities are a so-called "legal" investment of trust funds, without liability for depreciation or loss through error of judgment." (emphasis added)
In light of these facts and the applicable law, I question whether plaintiffs have established a breach of trust. Although there is a presumption of correctness of trial court findings where disputed evidence is presented ore tenus, the resolution of the current issues involves an application of law to facts. However, even assuming that there was a breach, I do not believe that the plaintiffs have shown any legal injury, but, it they have, they have not proven the extent of that injury.
We have been very restrictive with regard to allowing recovery for lost profits, primarily because such awards would often be based on very questionable evidence. TheRestatement appears to take a similar view, by limiting recovery for lost profits for breach of trusts in the absence of a breach of loyalty to situations where the trustee had a duty to purchase a specific piece of property. Restatement(Second) of Trusts § 205(c) and comment (c) and § 211. See alsoIn re Talbot's Estate, 141 Cal.App.2d 309, 296 P.2d 848
(Dist.Ct. 1956). Lost profits are easily ascertained with respect to failure to purchase a specific item, such as shares of XYZ Corporation. In addition, the trust instrument absolved the trustee from liability for any loss or depreciation due to its failure to dispose of assets received at the inception of the trust. While I agree, as we observed in Spragins I, that such an exculpatory clause may not save the trustee in all cases, this clause, along with the judicial policy of limiting speculative damages, is certainly a compelling factor in deciding whether there is liability for lost profits as opposed to actual losses.
Even assuming that lost profits are a proper element of damages, the evidence introduced to establish the amount of lost profits in this case is insufficient. The damages award was calculated with reference to the investment approach testified to by Mr. King,[1] the results of which are shown in plaintiffs' exhibit 501. The evidence shows that the trust suffered no actual loss. Principal increased from $536,000 to $776,168, a gain of 44.807%. Total income was $227,456. Mr. King's hypothetical approach saw principal increase from $570,000 to $1,234,108 a gain of 141.982%. Total income would have been $455,076. While the difference in the increase in principal seems significant, it is the result of a controversial investment philosophy.
First, Mr. King starts with the premise that all bank stock would be sold and reinvested. However, Mr. King agreed that the bank stock was a good investment in general, and his objection was solely that the trust res was too heavily concentrated in that stock. "[T]he trustee is liable only for such loss as results from the investment of the excess beyond the amount which it would have been proper so to *Page 970 
invest." Restatement (Second) of Trusts § 228 comment 1. Therefore, Mr. King began from the wrong starting point.
Mr. King then took the proceeds from the hypothetical sale and invested them in one of two investment vehicles, United States treasury bills (T Bills) or a portfolio of stocks known as the Standard Poor's 500 (S P 500). At all times he was either 100% invested in T Bills or 100% invested in the S P 500. He stated that he made the decision as to where to invest based upon information known to the trustee at the applicable times and not on the basis of hindsight. Clearly, the trustee's performance can not be judged on the basis of hindsight.Baldus v. Bank of California, 12 Wn. App. 621, 530 P.2d 1350
(1975).
It is undisputed that diversification is a risk-reduction technique employed by trustees in furtherance of their duty to preserve capital and generate reasonable income. It is interesting that Mr. King argues that diversification is necessary and then adopts an arguably risky investment philosophy. Mr. King's policy is not really one of diversification; it is one of market timing. At all times, he is invested entirely in T Bills or in the S P 500.
 "The difference between speculation and investment is well described by Dr. Headley in Headley, Trust Investments, 97 Trusts Estates 739 (1952). . . . As Dr. Headley states, one who buys common stocks with the idea of selling them on the market for higher prices is speculating. One who is making a prudent investment examines the stocks' intrinsic values and purchases them for a long-term investment."
First Alabama Bank of Montgomery, N.A. v. Martin, 425 So.2d 415
(Ala. 1983). Mr. King takes issues with Dr. Headley's view:
 "Q. And to go back and forth like that is much more of what they call a trading aspect as opposed to a long-term investment; isn't it?
 "A. Absolutely not. The turnover in this type of management is actually considerably less than it is under most conventional management forms. By turnover I mean buying and selling stocks. You buy and sell a lot of stocks in very short periods of time. By that I mean if you sell all of your stocks at year end, but then you don't have any transactions for two years, so that it has a tendency to average out in a very low turnover. It isn't a trading philosophy as much as if it turned out to be anything, and we didn't start out this process by determining that the strategy was. It ended up as a result of what we were reading, but it would be more of a market-timing philosophy, not a trading philosophy." (emphasis added)
Regardless of whether Mr. King is correct or Dr. Headley is correct, it is clear that Mr. King's market-timing philosophy is somewhat unconventional.
Mr. King uses the S P 500 in his hypothetical management approach but admits that he does not actually invest in the S P 500 because not all stocks in the S P 500 are of investment quality. He acknowledged that it would be difficult to scrutinize all 500 stocks and seems to suggest that the trustees could have used an index fund, but admits he does not know if such a fund is a legal trust investment.
Most importantly, the trustee's performance is being judged against Mr. King's remarkable ability to call changes in the stock market. He made ten or eleven investment decisions in his hypothetical approach and admits he did not make one mistake.
Plaintiffs' exhibit 153, reproduced in part below, shows the annual rates of return on selected investment alternatives for the years in question, except 1983:

6-Month T-Bill Year January July S P 500 1st
Ala.
1974 * 7.71 8.43 -26.47 -58.77
1975 7.14 6.32 *37.20 33.52
1976 5.65 5.95 *23.84 44.57
1977 * 4.65 5.41 — 7.18 21.49
1978 * 6.70 7.78 6.56 3.74
1979 10.08 9.47 *18. 19 2.09
1980 12.73 8.35 *31.48 44.69
1981 *14.96 15.21 — 4.85 18.52
1982 12.88 14.07 *14.81 — 2.82

The asterisks indicate where Mr. King invested the trust funds in his hypothetical. *Page 971 
Dr. Johnston, another expert, testified for the plaintiffs that for the period in question, the bank stock on average outperformed T Bills, government obligations, bonds, corporate bonds, and the S P 500. In other words, only through Mr. King's unusual ability to accurately switch in and out of the stock market was he able to produce the returns in his hypothetical management account. It is also readily apparent that if Mr. King had made only one error in switching funds, the change in the spread between the return generated through his approach and the actual return would have been significant.[2]
Speculation is not a sufficient basis for an award of damages. Mall, Inc. v. Robbins, 412 So.2d 1197 (Ala. 1982). In order to conclude that the damages award here is not the result of conjecture or speculation, one must come to the conclusion that it was reasonable to assume that a prudent investor armed with the knowledge available to this trustee could have, without any error, called ten or eleven turns of the market so that he was always in the investment vehicle that created the largest return — or, in other words, that this trustee should have performed perfectly. It is therefore my considered opinion that the damages calculated by use of Mr. King's approach are based upon speculation and conjecture and therefore do not provide an adequate basis for assessing damages in this case.
Simply put, the majority's opinion says that if a trustee, while operating within the guidelines established by the trust instrument, makes some error in judgment, even if it results in no actual loss, the trustee is nonetheless liable for profits that might have arisen if the trustee had been fortunate enough to accurately call every major turn of the stock market for a ten-year period. As this is now the law, I suspect that Mr. King will be a very busy and prosperous witness.
I dissent.
[1] The record reflects that Mr. King was the leading trust manager in North America from 1965 to 1975.
[2] For example based upon the information in plaintiffs' exhibit 153, in 1974 instead of an approximate 8% gain, a 26.47% loss would have resulted, in 1975 only an approximate 5% gain would result instead of a 37% gain, in 1976 an approximate 6% gain would result instead of a 23.84% gain, in 1977 a 7.18% loss rather than an approximate 5% gain would result, in 1970 an approximate 10% gain rather than an 18.19% gain would have resulted, in 1980 an approximate 11% gain rather than a 31.48% gain would have resulted, and in 1981 a 4.85% loss rather than an approximate 15% gain would have resulted. In 1978 and 1982 the differences between returns in T Bills and the S P 500 were negligible.