Filed 5/12/15  Cohen v. Cohen CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| DANIEL L. COHEN et al., | B245630 |
| Petitioners and Appellants, | (Los Angeles County Super. Ct. No. BP123027) |
| v. | |
| JEFFREY COHEN et al., | |
| Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Reva G. Goetz, Judge.  Reversed and remanded.

Todd T. Cardiff, under appointment by the Court of Appeal, for Petitioners and Appellants.

Lobb & Cliff and Greg Nylen; Schindler Eyrich, LLP, Trude Schindler and John F. Eyrich, Respondents.

_____

Petitioner and appellant Daniel Cohen sued his brother and sister-in-law, Jeff and Susan Cohen, the trustees of the Daniel L. Cohen 1980 Irrevocable Trust (Daniel's trust).[1] Daniel sought an accounting and alleged, among other things, that Jeff and Susan had breached their fiduciary duties toward him. At the close of Daniel's evidence in a bench trial, Jeff and Susan moved for judgment in their favor. The trial court found that Daniel had established that Jeff and Susan had breached their duties to Daniel in several ways, including self-dealing with trust funds. However, the court found that Jeff and Susan had acted in good faith, and therefore declined to award Daniel damages for a bad faith breach of the trust. Daniel appeals, arguing that there was insufficient evidence of good faith. We agree, and therefore reverse the judgment and remand for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

Daniel's trust was established in 1980. Under its terms, Daniel, as beneficiary, was to receive "as much of the income and principal of the trust estate as the Trustees [at all relevant times, his brother and sister-in-law], in their sole discretion, determine from time to time." The trust was Daniel's main, if not sole, means of support.

Two terms of Daniel's trust are relevant. First, the trust contained a clause indicating that the trustees had broad powers, "subject always to the discharge of their fiduciary obligations." The clause went on to state that "the Trustees shall not have the power to purchase, exchange, or otherwise deal with or dispose of the principal or the income of the trust estate for less than an adequate and full consideration in money or money's worth or the power to lend trust funds, without adequate interest or security."

Second, Daniel's trust contained an exculpatory provision stating, "No Trustee acting hereunder shall be responsible for any error of judgment of fact or law and he or

---

[1]     At trial, the parties stipulated to refer to all members of the Cohen family by their first names. We follow that agreement.

she shall be fully protected for any action taken in good faith in accordance with the advice of counsel or in reliance thereon."

1.    *The Origins of Daniel's Trust*

Jeff and Susan were not the original trustees of Daniel's trust.  Jeff had a similar trust, as did each of Jeff and Daniel's five cousins.  The trusts were established by Jeff and Daniel's grandfather, in order to provide assets for each of his grandchildren.  Prior to the facts giving rise to this case, all of the grandchildren's trusts were involved in a family business which owned and managed real estate (the prior family business).

2.    *Jeff and Daniel Leave the Prior Family Business*

In 2004, Jeff decided to leave the prior family business because he was unhappy with the way his cousins were managing it.  Daniel decided to leave with Jeff because he preferred to have Jeff, rather than his cousins, handle his financial affairs.  Cashing out from the prior family business was a lengthy process, due to the real estate investments.  In 2005, Daniel and Jeff became successor trustees of each other's trusts.[2]  In 2006, Jeff and Daniel created two entities by which Jeff would ultimately handle the investments for both trusts (as well as trusts for Jeff and Susan's sons, for which Jeff was also trustee).

The first entity was the Cohen Family Partnership (family partnership).  The partners in the family partnership were initially identified as Daniel, Jeff and Susan, Daniel's Trust, Jeff's Trust, and two trusts for each of Jeff and Susan's sons.[3]  Jeff was designated the managing general partner of the family partnership.

---

[2]    Some years later, Susan became co-trustee of Daniel's trust.

[3]    The final member of the family partnership was a company which owned a piece of real property.  This was a property which had been owned by the prior family business. Its ownership was transferred to a new limited liability company, in which Daniel's trust had a small interest.  The new limited liability company became a member of the family partnership.  Daniel's interest in this company was resolved by agreement in this litigation, and is not at issue in this appeal.

The second entity was Topanga Financial Management (family management company). The family management company was a corporation in which Jeff held 76 percent of the shares and Daniel held the remaining 24 percent. The family partnership contracted with the family management company to act as manager of the family partnership's investments. Under that contract, the family management company was to be compensated for its services in the amount of 2 percent of the total capital of the family partnership per year. From these fees, the family management company paid a salary to Daniel of $1000 per month, but it paid a higher salary to Jeff, in recognition of his greater responsibility in running the family partnership. The family management company also provided health insurance to its employees. Indeed, the family management company was formed in order to provide health insurance to family members, to pay them enough of a salary to justify the health insurance, and to pay office expenses. Both the family partnership and the family management company were located in an office in Jeff and Susan's home, to which Daniel had free access.

When he left the prior family business, Daniel's share of the business, held in his trust, had a balance of approximately $3.2 million. However, leaving the prior family business incurred a tax liability of nearly $1 million. At around this time, Daniel took $240,000 in cash from his trust. As a result, after taxes, Daniel's trust placed nearly $2 million in the family partnership. At this time, Daniel was receiving $7000 per month from his trust.

3.      *Jeff and Susan's Complex Investment Strategy*

Through the family management company, Jeff and Susan handled the investment of all the money in the family partnership, which included the great bulk of the money in Daniel's trust.[4] Jeff and Susan were better educated than Daniel and had more

---

[4]      As we have observed, Daniel's trust was a partner in the family partnership. His trust also had some investments outside the family partnership; the family management company handled those investments as well.

investment experience than he did. Although they tried to involve Daniel in the day-to-day investment decisions, Daniel preferred to trust his brother.

Jeff and Susan, with Daniel's knowledge and consent, came to believe that Jeff, Susan and Daniel had different investment goals than Jeff and Susan's children. Specifically, Jeff, Susan and Daniel needed income generation and aggressive growth, while Jeff and Susan's children needed capital preservation and growth. After speaking to investment advisors, Jeff, Susan and Daniel understood that aggressive growth of Daniel's assets was necessary in order to provide sufficient funds to continue the $7000 monthly payments for his lifetime.

In order to accomplish the different investment goals, Jeff and Susan established five different funds within the family partnership, known as partnership funds 1 through 5. Each fund had a different investment goal. For example, partnership fund 1 was geared toward capital protection tending towards growth, while the objective of partnership fund 3 was generating short term cash. Jeff and Susan intended to meet the individual investment goals of each of the trusts within the family partnership by allocating each trust's assets differently among the five partnership funds. Regardless of any percentage of family partnership asset ownership which might be implied by either the family partnership agreement or California law, Jeff and Susan treated the situation as though each of the partners owned *shares* in some or all of the partnership funds. Keeping track of which partner owned which percentage of each fund was made complicated by three additional facts: (1) Jeff and Susan sometimes had one partnership fund loan money to another partnership fund; (2) Jeff and Daniel's parents were permitted to invest in two of the partnership funds; and (3) partnership funds 4 and 5 were owned, in part, by the other three funds.

4.      *Jeff and Susan Take a Large Loan From the Partnership*

The key circumstance which would lead to the trial court's determination that Jeff and Susan breached the duty against self-dealing, albeit in good faith, was that Jeff and Susan made unsecured loans of family partnership money (out of partnership fund 1) to

5

themselves in their individual capacities. From 2007 through 2010, Jeff and Susan borrowed approximately $1.6 million in family partnership funds. Although the withdrawals were taken at different times, Jeff characterized all of the withdrawals as part of a single loan, as though he and Susan had an "open account" with the family partnership. The loan was not memorialized in writing, nor was there any security for the loan. Jeff and Susan used most of the loan proceeds for personal expenses, for example, by purchasing solar panels for their home. They used $50,000 in loan proceeds to invest in partnership fund 3, and $100,000 in loan proceeds to invest in partnership fund 5. The original interest rate on the loan to Jeff and Susan was 8 percent. In 2009, Jeff dropped the interest rate to 2 percent, based on the drop in market interest rates.[5] Jeff testified that he had reviewed broker statements for fixed income products in which the family partnership was invested, such as tax-free municipal bonds, and decided to lower the interest rate on that basis.

Jeff and Susan had not sought legal or other advice on whether it was appropriate to borrow money from the partnership. They believed it was acceptable to do so because the prior family business had regularly made loans to family members. When a family member had taken a loan from the prior family business, the loan never exceeded the family member's ownership interest in the prior family business. In contrast, Jeff and Susan's $1.6 million loan from the family partnership greatly exceeded their interest in the family partnership.

5.    *Daniel Complains*

The family partnership was hit hard in the stock market crash of 2008-2009. The aggressive investment strategy pursued by Jeff and Susan generated substantial losses. Daniel, however, continued to receive his $7000 per month, and raised no questions regarding Jeff and Susan's management of the family partnership and, through it, his

---

**5**    Jeff testified that he dropped the interest rate on all loans to and from the family partnership. The loan to Jeff and Susan, however, was the largest such loan. Jeff did not inform Daniel that he was reducing the interest rate.

trust. But, things came to a head in early 2010. Daniel asked Susan for several hundred thousand dollars from his trust to buy a house at auction. Susan responded that she would not give Daniel *her* money for him to buy a house. At this point, Daniel realized he had a problem. Believing that the funds in his trust were more than sufficient to cover the requested disbursement, Daniel asked Jeff for an accounting of his trust. When Jeff refused, Daniel hired counsel and ultimately filed suit.

6.      *Daniel's Petition*

On June 11, 2010, Daniel filed his petition in probate court against Jeff and Susan. Among other relief, Daniel sought an accounting, damages, and removal of Jeff and Susan as trustees of his trust. The petition related only to the administration of Daniel's trust; neither the family partnership nor the other partners were named as respondents.

In October 2010, the court removed Jeff and Susan as trustees (by their stipulation) and appointed Daniel the trustee of his own trust. There followed a rather convoluted process of Daniel's withdrawal of his trust from the family partnership. This necessitated an accurate listing of partnership fund holdings and determination of Daniel's trust's interest in each of the partnership funds, a process which was not as easy as, perhaps, it might have been.[6] When all was said and done, Jeff and Susan represented, and Daniel did not contest, that he was given full value for his trust's interest in the principal of the $1.6 million loan to Jeff and Susan, as well as his proportionate share of other family partnership assets. In other words, in calculating the amount necessary to buy Daniel's trust out of the family partnership, Jeff and Susan considered

---

**6**      To avoid unnecessarily liquidating securities (resulting in taxable events), it was agreed that Daniel's trust would receive a proportionate share of the securities held. Even then, a straightforward proportionate split of the securities was not always possible. For example, some of the family partnership's holdings were securities which could only be held by accredited investors. While the family partnership could meet this standard, Daniel's trust alone could not. Therefore, Daniel's trust could not receive a proportionate share of these securities and, instead, had to receive their value another way.

Daniel's trust's share of the $1.6 million receivable, and made sure Daniel was given sufficient cash or other assets to cover that share.

As the case proceeded to trial and the parties attempted to negotiate an equitable distribution of family partnership assets, three events occurred which are relevant to our disposition of the appeal: (1) Daniel sought discovery of Jeff and Susan's personal financial information; (2) the family partnership became a party to the case; and (3) Jeff and Susan filed multiple amended and supplemental accountings. We briefly discuss the proceedings relevant to each issue.

7.    *Daniel Sought Discovery of Jeff and Susan's Personal Financial Information*

During discovery, Daniel learned that Jeff and Susan wrote dozens of checks to their personal accounts from the family partnership and family management company accounts. Concerned by the apparent commingling of funds and possibility of self-dealing, Daniel served subpoenas on financial institutions seeking Jeff and Susan's personal account records. Jeff and Susan moved to quash the subpoenas.

The court concluded that the subpoenas were prematurely overbroad. While Daniel might ultimately be entitled to discovery regarding Jeff and Susan's personal account information, the court believed that Daniel could first propound more narrowly-tailored discovery. For example, he could ask Jeff and Susan for specific records documenting the checks that Daniel questioned. If Daniel was unsatisfied with the responses he received to his narrowly-tailored discovery, he could then pursue the subpoenas for Jeff and Susan's personal financial records. The motion to quash was therefore granted without prejudice.

8.    *The Family Partnership Became Involved in the Case*

In the course of their briefing in connection with the motion to quash, Jeff and Susan argued that the questionable checks were irrelevant to this case, because Daniel's petition involved only his *trust*, while the questionable checks were from *family*

8

*partnership* or *family management company* accounts. Shortly thereafter, Daniel moved to add the family partnership as a respondent to his petition.

Daniel's motion was granted. The family partnership appeared in the case. Although the family partnership had separate counsel, it was completely aligned with Jeff and Susan against Daniel's petition. Neither the family partnership itself, nor any of its other partners (which were, it is to be remembered, mostly trusts for Jeff and Susan's sons, of which Jeff was trustee) had any concerns regarding Jeff and Susan's management of the family partnership and its investments.

At trial, counsel for the family partnership represented that the partnership was not objecting to any defect in Daniel's pleading (such as a failure to bring a derivative action). Counsel conceded that Daniel's trust's claims "would be deemed to apply to the extent of his proportionate ownership interest in the partnership."

9.      *Jeff and Susan Filed Multiple Amended and Supplemental Accountings*

When the petition was originally filed, in June 2010, Daniel sought an accounting of his trust. After some delays, Jeff filed, on December 1, 2010, a trustee's report and summary of account for Daniel's trust. Amended and/or supplemental reports followed on February 28, 2011 and March 25, 2011. Daniel filed a number of objections to the latter accounting. It was agreed that Jeff would file another amended accounting by September 9, 2011. Thereafter, in October 2011, Jeff and Susan's counsel gave to Daniel's counsel, but did not file with the court, a computer disk containing some 5000 pages of schedules which supported the family partnership aspect of the accounting for Daniel's trust.

The next accounting was filed in May 2012, less than one month before trial. This accounting, which would ultimately become Exhibit 8 at trial, was supported by an updated version of the 5000-page October 2011 schedules. Daniel cried foul at receiving a new 5000-page accounting so soon before trial, and moved to strike Exhibit 8. When it was explained to the court that this was simply an updated version of information which had been given to Daniel in October 2011, the court ordered Jeff and Susan to provide

9

reconciliation, showing the changes made between the October 2011 disk and Exhibit 8. The reconciliation was filed on June 15, 2012. After reviewing the reconciliation, and offering Daniel additional time to prepare to meet it, the court denied Daniel's motion to strike Exhibit 8.

Exhibit 8 would not, in fact, be the last accounting filed. During trial, several additional errors were discovered. The partnership then prepared a final valuation of Daniel's trust's interest in the family partnership, incorporating the necessary corrections. The parties stipulated to the admissibility of this exhibit.

10.    *The Course of the Trial*

The trial proceeded over many days.[7] Daniel's case consisted largely of his cross-examination of Jeff and Susan.[8] In that examination, Daniel identified further problems with line items in Exhibit 8, the then-current accounting. For example, Daniel elicited testimony regarding additional checks he considered questionable; Jeff also admitted errors in preparing the partnership tax returns. The parties met and conferred on these

---

[7]    It appears that the reporter's transcript of the trial provided on appeal may not be complete. Volume 4 of the transcript ends with the proceedings on June 25, 2012. It was discussed earlier that day that a third-party witness would fly down from Sacramento and testify at 11:00 a.m. the next morning. When the matter was adjourned, to recommence at 11:00 a.m. the following day, Susan was on the stand, being questioned by counsel for the family partnership, who indicated another 10 or 20 minutes of questioning. The next volume of the transcript commences with the afternoon session on June 26, 2012. Susan is on the stand, and in the midst of questioning by Daniel's counsel. Apparently, proceedings were held on the morning of June 26, 2012, in which Susan gave further testimony and the third-party witness may have testified as well. None of the parties to this appeal indicates that anything of significance occurred during the missing session.

[8]    In addition to the trial strategy discussed in the body of this opinion, Daniel also pursued the theory that Jeff and Susan had violated the prudent investor rule by investing his trust's assets too aggressively. He elicited expert testimony that, had a more conservative approach been taken, his trust would have substantially more present value than it actually did. The trial court concluded that Daniel had agreed to the aggressive investment strategy, so declined to award damages on this theory. On appeal, Daniel does not challenge this portion of the trial court's ruling.

10

issues. Jeff and Susan provided additional proof which satisfied Daniel that nearly all of the questionable checks were not problematic; Jeff and Susan also eventually stipulated to file corrected tax returns at their expense.[9]

There was one area, however, in which Daniel elicited testimony regarding possibly erroneous line items in the accounting which Jeff and Susan did not agree to correct: the $1.6 million loan. Daniel did not challenge Jeff and Susan's representation that Daniel's trust had been fully reimbursed for its share of the principal of this obligation. He did however, question Jeff's unilateral reduction of the interest rate on the loan from 8 percent to 2 percent. Further, he questioned whether the data in Exhibit 8 confirmed that Jeff and Susan properly paid the family partnership even the interest that they had agreed to pay. Exhibit 8 shows that Jeff and Susan made only three interest payments over the life of the loan. Although Daniel did not present expert testimony at trial showing those payments to have been inadequate, his counsel's examination of Jeff raised concerns that the interest payments were not, in fact, sufficient to cover the accrued interest.

11.     *Jeff and Susan's Motion for Judgment*

At the close of Daniel's case, Jeff and Susan moved for judgment under Code of Civil Procedure section 631.8. The motion was argued at great length. During the course of the argument, the trial court indicated that it was tentatively inclined to find that Jeff and Susan had breached some of their duties to Daniel. Due to the exculpatory clause in Daniel's trust for "error[s] of judgment of fact or law," as well as Probate Code section 16440, subdivision (b), the court was concerned with whether Daniel's evidence

---

**9**       The remaining amount in dispute regarding questionable checks was minimal; Jeff and Susan agreed to pay it.

11

established that Jeff and Susan had acted in bad faith.[10] In the absence of bad faith, the court felt it could award no damages.

Daniel's counsel argued that the $1.6 million loan itself constituted bad faith. Jeff and Susan had loaned themselves money from the family partnership (and, therefore, in part from Daniel's trust) on terms which were very likely more favorable than they could have received elsewhere. Specifically, the loan was unsecured and Jeff unilaterally lowered the interest rate from 8 percent to 2 percent during the life of the loan. Daniel's counsel argued that the loan had far exceeded the amounts Jeff and Susan had contributed into the family partnership, and there was no indication that they would ever be able to repay the loan.

After argument, the court granted Jeff and Susan's motion for judgment.[11] Specifically, the court found that Jeff and Susan had breached their fiduciary duties to Daniel in three ways – they failed to properly review the partnership tax returns; they engaged in self-dealing by means of the $1.6 million loan; and they failed to avoid conflicts of interest (the loan again). However, the court concluded that the exculpatory clause in Daniel's trust and Probate Code section 16440, subdivision (b) applied. The court concluded that Jeff and Susan had not acted in bad faith with respect to the $1.6 million loan. The court specifically found that there was no effort to hide the loan from Daniel. The court concluded that the loan was "misguided" and constituted "poor judgment," but was not made in bad faith. The court was persuaded by the fact that similar loans to family members had been made by the prior family business, which led Jeff and Susan to believe that they could properly take the loan from the family partnership. The court further noted that, although the loan had not been intended as a

----

**10** Probate Code section 16440, subdivision (b) provides that if a trustee who committed a breach of trust "has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability . . . if it would be equitable to do so."

**11** The court concluded that a few issues were still outstanding; those issues were subsequently resolved, and are not at issue in this appeal.

12

fixed income investment for the family partnership, it had actually operated as one, and protected Daniel's trust from further losses from Jeff and Susan's unsuccessful aggressive investment strategy. In the absence of a finding of bad faith, Daniel had failed to present a cognizable theory of damages, given that Daniel's trust had been reimbursed for its share of the loan principal.

12.    *Attorneys' Fees*

A trust beneficiary may be entitled to attorneys' fees from a trustee who opposes the trust beneficiary's contest of the trustee's accounting without reasonable cause and in bad faith. (Prob. Code, § 17211, subd. (b).) Although the trial court expressly found that Jeff and Susan did not oppose Daniel's contest in bad faith, the court determined that equity required a small award of fees. Specifically, the court believed that – although most of the accounting and distribution issues were resolved prior to trial – it took nearly two years of litigation for Daniel to finally obtain an accurate accounting and distribution of trust assets, due in part to Jeff's complex investment scheme and self-dealing. The court therefore ordered Jeff and Susan to pay $43,467 in fees, for Daniel's efforts in obtaining an accounting and distribution of assets. By the time the court entered its order for the payment of attorneys' fees, Daniel had substituted out his trial counsel and substituted in a new attorney; the court ordered the fees to be paid to Daniel's former trial counsel's client trust fund.

Daniel filed timely notices of appeal from the court's judgment and the award of attorneys' fees.

### ISSUES ON APPEAL

The main issue raised by Daniel is whether the trial court erred by concluding at the end of Daniel's case that there was insufficient evidence that Jeff and Susan had acted in bad faith and were therefore exculpated from liability. We resolve this issue, in part, in Daniel's favor. This requires reversing the judgment for a continuation of the trial. Daniel next argues that he is entitled to a new trial for three reasons: (1) the trial court

13

erred in quashing his subpoenas for Jeff and Susan's personal financial information; (2) the trial court erred in denying his motion to strike Exhibit 8; and (3) the trial court improperly shifted the burden to establish errors in the accounting to him. We reject each contention. Finally, Daniel argues that he is entitled to additional attorneys' fees and that the attorneys' fees already awarded should be paid to Daniel himself or his current counsel. We conclude that any claim for additional attorneys' fees is premature, in light of our disposition of the appeal. We reject the argument that the court improperly ordered the fee award to be paid to Daniel's former trial counsel.

## *DISCUSSION*

1. *Standard of Review*

Code of Civil Procedure section 631.8, subdivision (a), provides, in pertinent part: "After a party has completed his presentation of evidence in a trial by the court, the other party, without waiving his right to offer evidence in support of his defense or in rebuttal in the event the motion is not granted, may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party . . . ." "In weighing the evidence, the trial judge may exercise the prerogatives of a fact trier by refusing to believe witnesses . . . . If the motion is granted his or her findings are entitled to the same respect on appeal as any other findings and are not reversible if supported by substantial evidence." (*Ford v. Miller Meat Co.* (1994) 28 Cal.App.4th 1196, 1200, citations omitted.)

2. *Insufficient Evidence that Jeff and Susan Acted in Good Faith*

A trustee has a duty to administer the trust solely in the interest of the beneficiaries. (Prob. Code, § 16002, subd. (a).) This is the duty of loyalty. The duty of loyalty is the most fundamental duty imposed on trustees; its purpose is to protect the interest of the beneficiaries. "The duty of loyalty requires a trustee to subordinate his or her interests to those of the beneficiaries in every regard." (*Uzyel v. Kadisha* (2010)

14

188 Cal.App.4th 866, 905 (*Uzyel*).) The breach of the duty of loyalty, or any of several other statutory duties, is considered a breach of trust. (Prob. Code, § 16400.)

Probate Code section 16440 sets forth different measures of damages which may apply when a trustee commits a breach of trust: "(a) If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances: [¶] (1) Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest. [¶] (2) Any profit made by the trustee through the breach of trust, with interest. [¶] (3) Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust. [¶] (b) If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."[12]

Daniel first argues that, when a trustee has committed a breach of the duty of loyalty by self-dealing, the trustee cannot avoid damages by a finding of good faith under Probate Code section 16440, subdivision (b). In other words, Daniel takes the position that a breach of the duty of loyalty constitutes bad faith as a matter of law. Daniel's second argument is that, in this case, there is insufficient evidence of good faith. We reject Daniel's first argument, but agree with his second.

### A. A Breach of the Duty of Loyalty is Not Bad Faith as a Matter of Law

In order to properly discuss Daniel's argument that a breach of the duty of loyalty constitutes bad faith as a matter of law, we must briefly discuss the predecessor statutes to Probate Code section 16440. This statute was enacted in 1986, and it superseded former Civil Code sections 2237 and 2238. (Cal. Law Revision Com. com., 54A pt. 1

---

[12] The interest referred to in Probate Code section 16440, subdivision (a) is the *greater* of (1) the interest that accrues at the legal rate on judgments in effect during the period when the interest accrued and (2) the amount of interest actually received. (Prob. Code, § 16441, subd. (a).) As with Probate Code section 16440, the court may excuse liability for interest in these amounts if the court finds the trustee acted reasonably and in good faith. (Prob. Code, § 16441, subd. (b).)

West's Ann. Prob. Code (2011 ed.) foll. § 16440, pp. 265-266.) The repealed statutes set forth different measures of damages for breach of trust depending on the specific duty breached by the trustee. Under former Civil Code section 2237, a trustee who used or disposed of trust property for the trustee's own profit " 'may, at the option of the beneficiary, be required to account for all profits so made, or to pay the value of its use, and, if [the trustee] has disposed thereof, to replace it, with its fruits, or to account for its proceeds with interest.' " (*Estate of Talbot* (1956) 141 Cal.App.2d 309, 322, italics omitted.) In contrast, under former Civil Code section 2238, a trustee who used or disposed of the trust property in any manner not authorized by the trustee, but in good faith and with the intent to serve the interests of the beneficiary, " 'is liable only to make good whatever is lost to the beneficiary by [the trustee's] error.' " (*Talbot,* at p. 309, italics omitted.) Thus, under the law prior to the enactment of Probate Code section 16440, a trustee breaching the duty of loyalty was liable under one of several measures of damages, at the beneficiary's choosing, but a trustee breaching any other trust duty in good faith was liable only to make good whatever was lost.

Probate Code section 16440 combined the two former Civil Code provisions into a single statute which gives the trial court, not the beneficiary, the discretion to select the appropriate measure of damages. Moreover, the new statute grants the trial court discretion to excuse the trustee from liability for *any* breach of trust committed reasonably and in good faith, if it would be equitable to do so. This provision was intended to "generalize the good faith exception [of former Civil Code section 2238] in order to give the court discretion to excuse the trustee in whole or in part from liability if the trustee has acted reasonably and in good faith under the circumstances as known to the trustee." (Recommendation proposing The Trust Law (Dec. 1985) 18 Cal. Law Revision Com. Rep. (1986) p. 559.)

Thus, the history of Probate Code section 16440 is in line with the plain language of the statute. The court may excuse a trustee for liability for *any* breach of trust if the trustee acted reasonably and in good faith. Breach of the duty of loyalty is not treated differently than any other breach of trust under the statute.

16

The good faith exception to damages under Probate Code section 16440 creates an exception, not a rule. Probate Code section 16440, subdivision (a) sets forth the general proposition that a trustee who commits a breach of trust "is chargeable with any of the following [measures of damages] that is appropriate under the circumstances." Subdivision (a) does not indicate that *no damage award* is an option; instead it provides for three alternative measures of damages. Subdivision (b) provides that the trial court may "excuse the trustee in whole or in part" from liability if the trustee acted in good faith and it would be equitable to do so. To be *excused* from damages, under what the California Law Revision Commission referred to as the "good faith exception," the breaching trustee must establish that it acted reasonably and in good faith. The trustee must also demonstrate that relief from damages would also be equitable. The beneficiary need not establish that the breaching trustee acted in bad faith in order to obtain damages; the beneficiary has the right to damages under Probate Code section 16440, subdivision (a) once a breach of trust has been established. The breaching trustee has the burden to establish, if it can, that it acted reasonably and in good faith, justifying a determination that it be excused from damages the trial court should otherwise impose.

The wisdom of good faith being an *exception* to the rule is especially applicable to a breach of the duty of loyalty. When a trustee breaches the duty of loyalty by self-dealing, "there is moral turpitude in a very real sense." (*Talbot, supra,* 141 Cal.App.2d at p. 327.) It is well-established that the good faith of a trustee who self-deals is immaterial to the trustee's breach of the duty of loyalty. (*Estate of Howard* (1955) 133 Cal.App.2d 535, 541.) This is known as the "no further inquiry rule." (*Uzyel, supra,* 188 Cal.App.4th at p. 906.) Under this rule, we do not ask whether the trustee acted in good faith, the terms of the transaction were fair, or the trust suffered any damages. Once the trustee has engaged in self-dealing, the breach of loyalty is complete. (*Id*. at pp. 905-906.) This does not, however, mean that the trustee's good faith is not relevant to the issue of damages, which is exactly what section 16440, subdivision (b) dictates. The "no further inquiry rule" relates to liability only; good faith may still be relevant to remedy. (Rest.3d Trusts, § 78, com. d.)

17

We conclude that, although a breach of the duty of loyalty does not constitute bad faith as a matter of law, a beneficiary is entitled to damages under Probate Code section 16440, subdivision (a) upon establishing a breach of the duty of loyalty without having to also establish bad faith. The burden of proof then switches to the breaching trustee to establish that, under the circumstances of the case, it would be equitable to excuse the trustee from damages because it acted reasonably and in good faith. We now turn to that factual issue.

      B.      <u>The Evidence is Insufficient to Support the Trial Court's Conclusion that Jeff and Susan's Breach of the Duty of Loyalty was in Good Faith</u>

The trial court, found that the $1.6 million loan Jeff and Susan took from the partnership was not in bad faith. In at least three respects, we believe that conclusion is unsupported by the evidence.

First, Jeff and Susan admitted that they used $150,000 of loan proceeds to invest in partnership funds 3 and 5. By means of this loan, Jeff and Susan intended to funnel to themselves *any profit earned by $150,000 of partnership funds* in excess of the fixed interest they had agreed to pay. That this transaction was not hidden from Daniel and that Jeff and Susan subsequently compensated Daniel's trust for its share of the principal of this loan do not undermine the fact that Jeff and Susan used the construct of the loan to take partnership, and therefore trust, profits for themselves. This is the essence of a bad faith breach of the duty of loyalty.

Second, the evidence is undisputed that Jeff unilaterally reduced the interest rate on the loan from 8 percent to 2 percent in 2009. Jeff testified that he justified the reduction based on his understanding that the trust was earning reduced interest on fixed-income products such as tax-free municipal bonds. He did not testify that the trust could earn no more than 2 percent interest on a $1.6 million unsecured personal loan on the open market; nor did he testify that he and Susan could obtain an unsecured line of credit in that amount at such a reduced interest rate from another lender. Finally, there was no evidence presented that, even if fixed-income products *then available* were offering

18

interest rates of only 2 percent, it was somehow appropriate to similarly reduce the interest rate on funds already borrowed and outstanding. By unilaterally reducing the interest rate on the approximately $600,000 outstanding at the time of the reduction, Jeff simply chose to deprive both the family partnership of $36,000 per year in interest that it was otherwise entitled to under the then-existing interest rate, and Daniel's trust of its proportionate share of that amount. Without more, there is insufficient evidence that this act was reasonable and in good faith.

Third, our review of the evidence indicates that Jeff and Susan did not actually pay the family partnership even the reduced interest they claimed they were obligated to pay.[13] In July 2008 (when the interest rate was still 8 percent), Jeff and Susan made an interest payment of $13,236 that, according to Jeff's testimony, was sufficient to pay the interest that had accrued on the loan for the first half of 2008. In the trial court's own questioning of Jeff, the court appeared to express some skepticism with this conclusion. Even a back-of-the-envelope calculation shows the court's concern was well-founded. Jeff and Susan had borrowed over $300,000 by the end of 2007. Six months of 8 percent annual interest on $300,000 is $12,000. But Jeff and Susan had also borrowed substantial sums during the first half of 2008. On February 1, they borrowed $50,000. Five months of 8 percent annual interest on $50,000 is an additional $1666. Thus, the $13,236 interest payment was not sufficient to cover the interest on the sums borrowed in 2007 plus the very first amount borrowed in 2008. The problem, however, is much larger than the difference between $13,666 and $13,236. Jeff and Susan had borrowed nearly $400,000 *more* during the first six months of 2008, all of which was accruing interest from the

---

[13] On appeal, Jeff and Susan argue that Daniel waived all claims regarding errors in the accounting because he stipulated to the final accounting submitted by the family partnership during trial. The record does not support this argument. Daniel stipulated to the *admissibility* of the exhibit; he did not stipulate to its *accuracy*. Similarly, Jeff and Susan argue that Daniel reviewed the entire accounting and limited his objections to only a handful of checks he questioned. We again disagree. The record reveals that Daniel's objections to *checks* were resolved for all but a few such checks. This agreement did not extend to any objections to the accounting beyond the identified checks.

19

moment each amount was borrowed – and none of that interest was paid by Jeff and Susan in July 2008, despite Jeff's testimony to the contrary. (For example, Jeff and Susan borrowed $150,000 in early April 2008. Three months of interest on that amount alone is an additional $3000, which is not covered by the $13,236 payment.) There are similar issues with Jeff and Susan's 2010 payment of $44,000 interest, which even superficial calculations reveal to be woefully inadequate to cover the interest which had accrued over the intervening two and one-half years.[14]

Given their understanding of how informal loans had been taken in the prior family business, Jeff and Susan acted in good faith in taking the loan, but there was insufficient evidence that Jeff and Susan acted reasonably and in good faith beyond that for the following reasons: (1) in taking loan proceeds to reinvest in the family partnership; (2) in unilaterally reducing the interest rate; and (3) in failing to pay the family partnership even the reduced interest claimed to be owed. The trial court therefore erred in concluding Jeff and Susan were excused from damages under the good faith exception of Probate Code section 16440, subdivision (b). The matter must be remanded for the completion of trial. Jeff and Susan will be entitled to present evidence that they did not breach any trust duties and that they acted reasonably and in good faith and, if they fail to do so, the trial court should select the appropriate measure of damages under section 16440, subdivision (a).

---

[14] On appeal, Daniel seeks judicial notice of an exhibit he prepared, purporting to calculate the total amount of interest underpaid by Jeff and Susan at an amount exceeding $50,000. The calculations presented are not supported by the testimony at trial. Jeff testified that whenever he and Susan took an additional loan from the family partnership, he calculated the number of days between the last loan and the present one, calculated interest on the total outstanding principal for those days, and added that amount to the interest due. In Daniel's exhibit, however, he calculates the amount of interest owed on the prior principal balance, and then adds the amount to the *principal* due, resulting in the next calculation of interest charging interest on existing principal *and the prior interest due*. There was no testimony that interest on the loan was to be compounded in this manner. We therefore deny the request for judicial notice.

20

3.     *The Court Properly Granted the Motion to Quash Without Prejudice*

Daniel next argues that the trial court erred in quashing his subpoenas for Jeff and Susan's personal account information.  We review the trial court's ruling on discovery motions for abuse of discretion.  (*Lappe v. Superior Court* (2014) 232 Cal.App.4th 774, 779.)  A review of the procedure leading to the trial court's ruling establishes that the court did not abuse its discretion.

During discovery, Daniel learned of several questionable checks written from the partnership accounts to Jeff and Susan's personal accounts.  Daniel served subpoenas on financial institutions seeking Jeff and Susan's personal account records, which Jeff and Susan sought to quash.  As part of their effort to meet and confer, Jeff and Susan provided Daniel with copies of their personal financial records pertaining to the specific questionable checks Daniel had identified, although the records provided were otherwise redacted.  Daniel was not placated by this and continued to pursue the subpoenas; Jeff and Susan filed their motion to quash.  Jeff and Susan argued that, even if Daniel was entitled to some limited discovery arising from the questionable checks, Daniel's subpoenas – which sought *all* of Jeff and Susan's private financial information from January 2006 to the present – were egregiously overbroad.

Daniel opposed the motion, arguing that Jeff and Susan's commingling of personal funds with family partnership funds gave him an absolute right to discover Jeff and Susan's financial information.  At the hearing on the motion to quash, Daniel added that he was entitled to Jeff and Susan's financial information because of the $1.6 million loan.  Specifically, Daniel wanted to trace the loan proceeds (which Jeff and Susan had admitted were used for personal expenses) and also wanted to know the different loans of which the $1.6 million total had been comprised.

The court was of the opinion that Daniel's subpoenas were overbroad.  The court believed that all of Daniel's concerns could be satisfied by more narrow discovery; Daniel could propound specific discovery requests regarding the questionable checks, tracing the proceeds of the $1.6 million loan, and asking how the $1.6 million was

21

configured. Daniel conceded that he had recently propounded specific discovery on the latter two issues, and had not yet received responses. As to the questionable checks, the court indicated its view that the redacted financial statements provided by Jeff and Susan's counsel were insufficient, and that Daniel's attorney should be provided unredacted versions of the statements. In light of the fact that additional discovery was pending regarding the issues purportedly justifying the subpoenas, the court concluded that the subpoenas were premature. The court specifically told Daniel that he would not be required to accept Jeff and Susan's discovery answers as the truth, and that, if he had concerns regarding their responses, he could again pursue the bank record subpoenas. The motion to quash was granted without prejudice.

On appeal, Daniel concedes that he did not pursue the further subpoenas; he argues that he should not have been required to pursue his then-pending discovery in order to obtain the bank records. Daniel argues that the trial court erred in granting the motion to quash on the basis that he was absolutely entitled to discovery to trace the proceeds of the $1.6 million loan. But, at the hearing on the motion to quash, Daniel conceded that he had recently propounded discovery geared toward this precise issue, and had not yet received a response. The trial court ruled that Daniel could re-issue the subpoenas if the response to his specific discovery on the issue of tracing was not sufficient, but that, until that occurred, the subpoenas would be quashed as premature. This does not constitute an abuse of discretion. Daniel failed to identify any legitimate purpose to the subpoenas that could not be satisfied by the more targeted discovery he had already propounded, and the court left open the possibility that he could pursue the subpoenas if the current discovery proved unsatisfactory.

4.    *The Court Did Not Err in Admitting Exhibit 8*

Daniel next contends that the trial court prevented a fair trial by denying his motion to strike Exhibit 8, the May 2012 accounting. Although Daniel frames his argument in terms of the denial of a fair trial, it is, in essence, an argument that the court

22

abused its discretion in admitting the late-filed document. A full discussion of the circumstances leading to the court's ruling reveals no error.

As early as September 22, 2011, Jeff and Susan's counsel made the court aware that their next accounting would include schedules for the family partnership, as well as Daniel's trust, and would therefore near 5000 pages in length. Jeff and Susan's counsel proposed to submit the schedules on disk. While Daniel had no objection, the court was uncertain as to whether the court had the capability of processing a filing on disk. Ultimately, in October 2011, Jeff and Susan's counsel transmitted the 5000 pages of schedules to Daniel's counsel on disk, but did not file it with the court. Daniel's counsel chose to disregard these schedules in his trial preparation, and focused only on the prior accounting which had been filed with the court in March 2011.

On May 3, 2012, Jeff and Susan filed Exhibit 8, a 5000-page accounting that incorporated and updated the documents transmitted to counsel in October 2011. Daniel moved to strike Exhibit 8 claiming that he did not have sufficient time to review a massive document in advance of trial. Jeff and Susan argued that there was nothing prejudicial in the filing of Exhibit 8, because it simply included family partnership schedules that had been provided to Daniel's counsel in October 2011. Daniel's counsel disagreed, arguing that Jeff and Susan's counsel had represented that Exhibit 8 corrected mistakes on the October 2011 disk, and it was unfair to require Daniel's counsel to wade through two 5000-page accountings to hunt down the differences. The trial court then ordered Jeff and Susan's counsel to provide a reconciliation, identifying all changes made between the information on the October 2011 disk and Exhibit 8.

The reconciliation was filed on June 15, 2012. The reconciliation described and identified (in 21 attached exhibits), the changes between the October 2011 disk and Exhibit 8. The court heard further argument and admitted Exhibit 8. The court reasoned as follows: the bulk of the schedules had been given Daniel in October 2011; any updates to the schedules had been specifically identified in the reconciliation; and the court offered Daniel additional time to prepare in order to meet the reconciliation.

23

Under the circumstances, the trial court did not err. Had Exhibit 8 been a new 5000-page document sprung on Daniel right before trial, Daniel might have had cause to complain. Instead, the exhibit was similar to information which had been given to Daniel more than six months earlier, in October 2011. To the extent Exhibit 8 differed from the October 2011 information, Jeff and Susan provided a reconciliation identifying all of the differences, and the court offered Daniel additional time if necessary to respond to the reconciliation. To the extent Daniel's concerns stem from his failure to address the October 2011 schedules in his trial preparation, he makes no argument why this should prevent Jeff and Susan from relying on the successor to those schedules, when they had been timely given to Daniel. We find no abuse of discretion.

5.       *The Court Did Not Shift the Burden of Proof to Daniel*

Daniel argues that the trial erred by shifting the burden of proving errors in the accounting to him, rather than requiring Jeff and Susan to establish the propriety of the accounting. Our review of the record indicates that this did not occur. When Jeff and Susan argued their motion for judgment, they went through every written objection Daniel had filed in response to their accounting. In opposing the motion, Daniel argued that Jeff and Susan had the burden of proof, a proposition with which Jeff and Susan agreed. They were correct to do so. The burden is on a trustee to establish the correctness of every item in its accounting. (*Purdy v. Johnson* (1917) 174 Cal. 521, 531.)

Some of the confusion may have arisen because, in this case, the final accounting (Exhibit 8) was filed immediately before trial, and modified by an additional filing during trial, which prevented Daniel from filing pretrial objections to the accounting identifying areas of concern. The parties did, however, stipulate to amend the pleadings to conform to proof, resulting in the circumstance that, whenever Daniel elicited testimony raising issues with a line-item in the accounting, Jeff and Susan rightly took upon themselves the burden of proving its accuracy and/or simply compensating Daniel for his trust's share of the problematic entry.

24

6.      *The Trial Court's Award of Attorneys' Fees Was Not Erroneous*

Finally, Daniel challenges the award of attorneys' fees in his favor, arguing that he is entitled to additional fees, and that the fees he was already awarded should have been paid to him directly (or his present counsel) rather than his former trial counsel's client trust account. We disagree.

Daniel first argues that, because Jeff and Susan's self-dealing constitutes bad faith as a matter of law, he is necessarily entitled to additional attorneys' fees. This argument is both erroneous and premature. It is erroneous because a beneficiary's right to recover attorneys' fees depends on whether the trustee's *opposition* to the beneficiary's action contesting the accounting is in bad faith, not on whether the trustee acted in bad faith with respect to administering the trust. It is premature because the matter must be remanded for a continuation of the trial, where Jeff and Susan will have the opportunity to put on their case. Whether further attorneys' fees should be awarded will be a matter for the trial court to consider after trial.

Daniel's second argument, that the attorneys' fees were improperly awarded to his former trial counsel, was not timely made before the trial court and therefore will not be considered on appeal. This order came about as follows: There had been some confusion over the amount of fees to which Daniel was entitled. A hearing was held on March 25, 2013. At this time, Daniel's former trial counsel was present to testify as to the fees incurred. He testified, "the fees that are contained in the petition are still outstanding and owing to our firm." Prior to the hearing, Daniel's former trial counsel had prepared a proposed order which indicated the fee award was to be paid to his firm. Although Daniel's new counsel was present at the hearing, Daniel's new counsel did not interpose an objection to the proposed order, nor did she disagree with Daniel's former trial counsel's representation that he was still owed the fees. After submission, Daniel's new counsel did not submit a written objection to the proposed order. The court modified the amount of the award set forth in the proposed order prepared by Daniel's former trial counsel, and otherwise signed it. In the absence of any objection when the issue was

25

raised, Daniel cannot be heard on appeal to contest the court's award of the attorneys' fees to his prior counsel.[15] (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1138.)

In light of our disposition, the trial court may, if it so chooses, vacate the attorney's fees and wait to determine that issue at the conclusion of the trial.

### *DISPOSITION*

The judgment is reversed and the matter remanded for further proceedings consistent with this opinion. The postjudgment order for attorneys' fees is affirmed subject to the trial court's decision to vacate the award. Daniel shall recover his costs on appeal from Jeff and Susan.

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.

GRIMES, J.

---

[15] Daniel raised the issue before the trial court in a motion for reconsideration. At the hearing on the motion for reconsideration, the trial court asked Daniel's new counsel why she had not orally objected to the proposed order prepared by Daniel's former trial counsel; she replied that she had not read the proposed order clearly. When asked why she had not objected in writing to the proposed order after the hearing, Daniel's counsel replied that she had assumed the court would have read the substitution of counsel and corrected the order accordingly. The court found neither excuse sufficient to re-open the issue. Neither do we.

26